IN THE DISTRICT COURT OF COMANCHE COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA
Comanche County
FILED in the
Office of the Court Clerk

AUG 13 2025

By_____
Deputy

(1)  **KELLI GOODNIGHT** as
Personal Representative of the
**ESTATE OF RICKEY
MORPHIS,**

Plaintiff,

vs.

Case No.: CJ-2025-478

**ATTORNEY LIEN CLAIMED**

(1)  BOARD OF COUNTY
     COMMISSIONERS OF
     COMANCHE COUNTY,
(2)  MICHAEL MERRIT,
(3)  DAVID WEBER,
(4)  COMANCHE COUNTY
     HOSPITAL AUTHORITY,
(5)  GREGORY PFITZER, DO,
(6)  DAVID DARRIGAN, DO,
(7)  HESTON RICHARDSON,
     DO,
(8)  CHANCE MATTHESEN, DO,
(9)  JORDAN LEACH, DO,
(10) KATHRYN JONES, DO,
(11) METTY DESSALEGN, MD,
(12) FNU SAWYER,
(13) PRADEEP MADA, MD,
(14) MARK COTTON, DO,
(15) CHRISTIAN SELLERS, PA-C,
(16) JOHN/JANE DOES 1-5.

Defendants.

## PETITION

COMES NOW, Kelli Goodnight, as Personal Representative of the Estate of Rickey Morphis,

for her causes of action against the Board of County Commissioners of Comanche County

("County"), Michael Merrit ("Merrit"), David Weber ("Weber"), Comanche County Hospital

1

**Exhibit 2**

Authority ("CCHA"), Gregory Pfitzer DO ("Pfitzer"), David Darrigan DO ("Darrigan"), Heston Richardson DO ("Richardson"), Chance Matthesen DO ("Matthesen"), Jordan Leach DO ("Leach"), Kathryn Jones DO ("Jones"), Metty Dessalegn MD ("Dessalegn"), FNU (first name unknown) Sawyer ("Sawyer"), Pradeep Mada MD ("Mada"), Mark Cotton, D.O. ("Cotton"), and Christian Sellers, PA-C ("Sellers"), and John/Jane Does 1-5 (staff or contractors at Comanche County Detention Center), alleges and states as follows:

## INTRODUCTORY STATEMENT

1.     This civil action arises from the preventable deterioration and death of Rickey Morphis while he was in custody at the Comanche County Detention Center ("CCDC") and under the care of Comanche County Memorial Hospital and affiliated providers. Mr. Morphis entered custody on December 4, 2023, with a fresh surgical amputation of his right second toe and ongoing diabetic and wound-care needs.

2.     Within days of his arrest and transfer to CCDC, treating clinicians documented that Mr. Morphis was not receiving proper wound care at "his facility," and issued explicit dressing-change and monitoring instructions—orders that foreshadowed the infection and complications that followed.

3.     During incarceration, Mr. Morphis' diabetes and asthma management were altered at the request of jail personnel; providers also noted open wounds, cracked skin, and chronic osteomyelitis risks.

4.     His condition worsened. He required repeat imaging and was hospitalized from January 22–29, 2024 under the care of Comanche County Memorial Hospital, culminating in additional surgical intervention to his right foot.

5.     The Oklahoma State Department of Health (OSDH) cited CCDC for systemic safety and sanitation failures—repeatedly finding noncompliance with hourly sight checks, inadequate documentation, and unsanitary conditions—during the 2023 and 2024 inspections. These deficiencies reflect a culture of disregard for basic inmate health and safety.

2

**Exhibit 2**

6.      After release from custody in or about May 2024, Mr. Morphis continued to struggle with persistent infection and complications. He presented again on July 31, 2024 and died on or about August 1, 2024, with unresolved osteomyelitis at the amputation site identified as a contributing factor.

7.      Plaintiff Kelli J. Goodnight brings this action as the court-appointed Personal Representative of Mr. Morphis' Estate, for constitutional violations under 42 U.S.C. § 1983 and related state-law claims, including negligence, wrongful death, and medical negligence.

8.      Plaintiff has satisfied conditions precedent, including serving Governmental Tort Claims Act ("GTCA") notice on the Comanche County Hospital Authority on November 19, 2024; the notice period has expired and the claims are deemed denied, and this lawsuit is timely filed.

## THE PARTIES

Plaintiff re-alleges and incorporates the foregoing paragraphs, as though full set forth herein.

9.      Plaintiff Kelli J. Goodnight is the duly appointed Personal Representative of the Estate of Rickey Morphis by Order of the District Court of Comanche County, Case No. PB-2024-249 (Jan. 29, 2025). She prosecutes this action on behalf of the Estate and statutory beneficiaries.

10.     Rickey Morphis was arrested in Lawton, Oklahoma on December 4, 2023, booked at the City of Lawton jail, and transferred that night to CCDC. He died on or about August 1, 2024.

11.     The Board of County Commissioners of Comanche County ("BOCC") is the proper party to be sued for tort claims against Comanche County and its departments, including CCDC. At all times material, the BOCC, through its final policymakers, established and maintained policies, customs, and practices governing the jail.

12.     Defendant Merrit is the elected Sheriff of Comanche County and the final policymaker for CCDC operations and training. He is sued in his individual capacity for damages under 42 U.S.C. § 1983 arising from deliberate indifference to known risks and failures to train/supervise, and in his official capacity to the extent required for claims against the County.

**Exhibit 2**

13.    Defendant Weber is/was the Jail Administrator responsible for day-to-day operations, supervision, and enforcement of medical and safety policies at CCDC. He is sued in his individual capacity under § 1983 for deliberate indifference and failure to train/supervise.

14.    The Comanche County Hospital Authority ("CCHA") is a public trust that owns/operates Comanche County Memorial Hospital and affiliated clinics (including Memorial Medical Group and Lawton Community Health Center). CCHA, acting by and through its employees/agents, provided care and treatment to Mr. Morphis during the period at issue, including but not limited to inpatient and outpatient care from January 22–29, 2024.

15.    Defendant Pfitzer is an Oklahoma-licensed physician who, on information and belief, participated in the evaluation and/or treatment of Mr. Morphis at CCHA-affiliated facilities during 2023–2024. He is sued for professional negligence and, to the extent applicable, under § 1983 for action under color of state law.

16.    Defendant Darrigan is an Oklahoma-licensed physician who, on information and belief, participated in the evaluation and/or treatment of Mr. Morphis at CCHA-affiliated facilities during 2023–2024. He is sued for professional negligence and, to the extent applicable, under § 1983.

17.    Defendant Richardson is an Oklahoma-licensed physician who, on information and belief, provided care to Mr. Morphis at CCHA-affiliated facilities during 2023–2024. He is sued for professional negligence and, where applicable, under § 1983.

18.    Defendant Matthesen is an Oklahoma-licensed physician who, on information and belief, participated in Mr. Morphis' care at CCHA-affiliated facilities during 2023–2024. He is sued for professional negligence and, where applicable, under § 1983.

19.    Defendant Leach is an Oklahoma-licensed physician who, on information and belief, participated in Mr. Morphis' care at CCHA-affiliated facilities during 2023–2024. He is sued for professional negligence and, where applicable, under § 1983.

20.    Defendant Jones is an Oklahoma-licensed physician affiliated with Memorial Medical Group who was involved with Mr. Morphis' surgical follow-up in December 2023. She is sued for professional negligence and, where applicable, under § 1983.

**Exhibit 2**

21.    Defendant Dessalegn is an Oklahoma-licensed physician who served as attending during Mr. Morphis' January 22–29, 2024 inpatient admission at Comanche County Memorial Hospital. She is sued for professional negligence and, where applicable, under § 1983.

22.    Defendant Sawyer is, on information and belief, a healthcare professional who participated in the provision of medical care to Mr. Morphis at CCHA-affiliated facilities during the relevant period. He/She is sued for professional negligence and, where applicable, under § 1983.

23.    Defendant Mada is an Oklahoma-licensed physician who, on information and belief, participated in the evaluation and/or treatment of Mr. Morphis at CCHA-affiliated facilities during 2023–2024. He is sued for professional negligence and, where applicable, under § 1983.

24.    Defendant Mark Cotton, D.O. is an Oklahoma-licensed physician who, on information and belief, participated in the evaluation and/or treatment of Mr. Morphis at CCHA-affiliated facilities during 2023–2024. He is sued for professional negligence and, where applicable, under § 1983.

25.    Defendant Sellers is an Oklahoma-licensed physician's assistant who, on information and belief, participated in the evaluation and/or treatment of Mr. Morphis at CCHA-affiliated facilities during 2023–2024. He is sued for professional negligence and, where applicable, under § 1983.

26.    Defendants John/Jane Does 1-5 are detention and/or medical personnel that are either employed or contracted at CCDC whose identities are not yet known, who participated in or were deliberately indifferent to the denial of necessary medical care, safe conditions, and monitoring of Mr. Morphis. They are sued in their individual capacities under § 1983 and for state-law negligence under the GTCA.

27.    At all times, the individual defendants acted within the scope of their employment or agency, and their conduct is attributable to their governmental employers under the GTCA and Monell principles, where applicable. CCDC's own records and state oversight reports reflect systemic lapses in sight checks, documentation, and sanitation during the period Mr. Morphis was housed there.

## JURISDICTION AND VENUE

Plaintiff re-alleges and incorporates the foregoing paragraphs, as though full set forth herein.

**Exhibit 2**

28.    This Court has subject-matter jurisdiction over Plaintiff's state-law claims pursuant to the Oklahoma Constitution and 12 O.S. § 2001 et seq., and concurrent jurisdiction over federal claims brought under 42 U.S.C. § 1983.

29.    Plaintiff has complied with the Oklahoma Governmental Tort Claims Act, 51 O.S. § 151 et seq. As to CCHA, written notice of the claim was served on November 19, 2024; the statutory denial period has expired and this lawsuit is timely filed.

30.    Venue is proper in Comanche County because the claims arose in this County; the County defendants reside and conduct official business here; and CCHA and Comanche County Memorial Hospital are located here. Mr. Morphis' arrest, booking, and transfer occurred in Lawton and CCDC, both within Comanche County.

31.    Personal jurisdiction is proper because each defendant resides in Oklahoma and/or committed the acts and omissions at issue in Oklahoma.

## FACTUAL BACKGROUND

Plaintiff re-alleges and incorporates the foregoing paragraphs, as though full set forth herein.

32.    Rickey Morphis ("Morphis") was a 51-year-old insulin-dependent diabetic with peripheral arterial disease and osteomyelitis. On November 24, 2023, he underwent a right second-toe amputation at Comanche County Memorial Hospital.

33.    Lawton police arrested Morphis at his residence on December 4, 2023 on outstanding warrants. The arresting officer noted Morphis had recently had two toes amputated and needed assistance, and he was taken first to the City of Lawton jail for booking and then to the Comanche County Detention Center ("CCDC") for holding.

34.    Morphis's first post-operative visit on December 11, 2023 documented that he was a newly incarcerated patient and that he believed he was not receiving proper wound care at his facility; the provider instructed the jail's nurse to perform daily wound-care dressing changes and to conduct weekly foot checks going forward.

6

**Exhibit 2**

35.     While in custody, Morphis' serious medical needs were obvious and repeatedly communicated by Morphis to jail staff and medical officials.

36.     Morphis continued to seek medical care while incarcerated. On December 19, 2023 he returned to surgery clinic; the provider removed sutures, obtained two wound cultures, and limited his time on his feet. On January 2, 2024 he again presented with an open 1 cm wound with 1–2 cm depth; the provider documented concern that jail staff were "starting to not take care of it" as they had earlier.

37.     Deterioration led to inpatient admission at Comanche County Memorial Hospital from January 22–31, 2024.

38.     On information and belief, family members were compelled to procure and deliver prescribed medications, including insulin-related prescriptions, because jail staff refused to obtain them.

39.     Across December 2023 through January 2024, outside providers repeatedly directed the jail on specific wound-care, including daily packing/dressings (iodoform/Xeroform then dry dressings), and requested weekly foot checks to track progression of diabetic foot ulcers—orders and concerns that underscore how frequently Morphis had to ask for and obtain care while under CCDC's control.

40.     CCDC's systemic failures in inmate monitoring and sanitation pre-dated and persisted through Morphis' incarceration. The Oklahoma State Department of Health ("OSDH") cited CCDC in June 2023 for failing to conduct and document hourly sight checks, failing to timely notify OSDH of inmate deaths, and for sanitation lapses (cells soiled with feces and urine, dirty showers, and unsafe razor practices).

41.     OSDH returned on May 14, 2024—squarely overlapping Morphis' custody period—and again found the facility "not in substantial compliance," including: (a) no written classification policy; (b) missing shift counts; (c) hourly sight checks not documented, including for lockdown cells that required 30-minute checks; (d) physical obstructions (blankets/plastic) preventing visual checks; (e) failure to notify OSDH when inmates were transferred to outside hospitals for serious injury; and (f) pervasive unsanitary conditions in multiple pods (strong urine odors; feces on walls/doors; debris-littered cells; dirty

**Exhibit 2**

showers). These findings corroborate that CCDC's practices during Morphis' confinement were chronically deficient.

42.      During his incarceration, CCDC staff repeatedly refused or failed to obtain and administer prescribed medications (including insulin and asthma medications). As a result, family members were compelled to pick up filled prescriptions and deliver them to the jail so Mr. Morphis could receive necessary medications, at times including insulin pens. These events occurred against a backdrop of jail medical alterations to his insulin regimen and outside providers' explicit wound-care directives that the jail failed to follow.

43.      After months of ongoing complications from a non-healed amputation site and recurrent infection, Morphis again decompensated. He presented to the hospital on July 31, 2024 with abdominal pain, fever, and tachycardia; he died the next day, August 1, 2024. A post-mortem review attributed his death, in part, to complications from unresolved osteomyelitis, which is a result of the failure to adequately treat the operative site despite repeated opportunities to intervene.

## CAUSES OF ACTION

### COUNT I: DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS (AGAINST: MERRITT, WEBER, JOHN/JANE DOES 1-5; AND TO THE EXTENT THEY ACTED UNDER COLOR OF STATE LAW WHILE PROVIDING JAIL MEDICAL CARE, ALL MEDICAL PROVIDERS IDENTIFIED)

Plaintiff re-alleges and incorporates the foregoing paragraphs, as though full set forth herein.

44.      While confined at the Comanche County Detention Center ("CCDC"), Mr. Morphis had obvious, serious medical needs, including a fresh surgical amputation wound, insulin-dependent diabetes, chronic/ongoing osteomyelitis risk, and asthma. Within days of incarceration, outside treating clinicians documented that he was not receiving proper wound care at "his facility" and issued explicit orders to the facility nurse for daily dressing changes and weekly foot checks.

**Exhibit 2**

45.    CCDC personnel and affiliated providers knew of these needs and the risk of rapid deterioration. Jail personnel asked that Mr. Morphis's insulin be changed to a sliding scale, and the LCHC prescriber accommodated that request while noting his sugars then ran in the 200–400 range; the same encounter documents asthma issues triggered by the "mustiness" of the jail and cracks/skin breakdown of the foot—conditions heightening infection risk.

46.    Despite this knowledge, Defendants failed to ensure the ordered wound care, monitoring, and medications were actually provided, and they unreasonably delayed or denied necessary care. Jail staff ignored or inconsistently performed the ordered daily dressing changes and weekly foot checks; providers who were functioning in concert with the jail acquiesced in custody-driven limitations and failed to escalate when their own directives were not followed, thereby allowing a known, substantial risk of serious harm to persist.

47.    Defendants further failed to secure and dispense prescribed medications and supplies in a timely, reliable manner—forcing family to procure and deliver medications because the jail refused to obtain them—compounding Mr. Morphis's uncontrolled diabetes and wound-care deficiencies.

48.    The risk to Mr. Morphis was amplified by well-documented, ongoing systemic lapses at CCDC that Defendants Merritt and Weber knew or should have known about and corrected, including chronic failures to document required hourly sight checks (and 30-minute checks for lockdown), obstructions to visual checks, and pervasive sanitation failures (e.g., cells with feces/urine, dirty showers). These conditions materially impeded monitoring of a post-operative diabetic inmate with an open wound and increased the likelihood of infection and delayed recognition of deterioration.

49.    Mr. Morphis repeatedly asked for care while incarcerated and presented to outside providers multiple times with ongoing wound problems; clinicians expressly recorded concern that the jail was "starting to not take care of it as well as they were in the beginning," confirming Defendants' awareness of continued noncompliance and risk.

9

**Exhibit 2**

50.     Sheriff Merritt (as the final jail policymaker) and Jail Administrator Weber had actual knowledge of Mr. Morphis's serious needs and the system's noncompliance—via direct orders transmitted to "the facility nurse," repeated outside appointments for the same problem, and OSDH deficiency findings during the relevant period—yet failed to train, supervise, or take reasonable steps to ensure staff carried out the prescribed care, secured medications, and timely transported Mr. Morphis when his condition worsened. Their deliberate inaction in the face of known risks violated clearly established Fourteenth Amendment rights (and Eighth, to the extent applicable).

51.     John/Jane Doe detention officers personally observed Mr. Morphis's condition and complaints and nevertheless denied or delayed access to care, failed to perform or document checks enabling timely intervention, and failed to carry out the daily wound-care and monitoring orders given for him—conduct that consciously disregarded a substantial risk of serious harm.

52.     The medical-provider defendants identified above, to the extent they were acting under color of state law (including through joint action with CCDC or by providing jail medical services for detainees), were deliberately indifferent when they deferred to non-medical jail requests to alter essential diabetic management, discharged him back to a facility they knew was not following their wound-care instructions without necessary safeguards or direct coordination, failed to ensure continuity of medications, and failed to escalate noncompliance despite repeated warning signs.

53.     As a direct and proximate result of Defendants' deliberate indifference, Mr. Morphis suffered unnecessary pain, repeated infection and decompensation requiring hospitalization and further amputation, and ultimately succumbed to complications associated with unresolved infection and diabetic decompensation; his decline was foreseeable and preventable had Defendants provided the ordered care, ensured medication access, and timely intervened.

54.     Defendants' conduct was willful, wanton, and in reckless disregard of Mr. Morphis's constitutional rights, warranting compensatory and punitive damages under 42 U.S.C. § 1983.

**Exhibit 2**

**COUNT II: 42 USC 1983: SUPERVISORY LIABILITY**
**(AGAINST: MERRIT, WEBER)**

Plaintiff re-alleges and incorporates the foregoing paragraphs, as though full set forth herein.

55.     Defendant Michael Merritt, as Sheriff of Comanche County, and Defendant David Weber, as Jail Administrator of the Comanche County Detention Center ("CCDC"), exercised supervisory authority over CCDC operations, including medical triage, access to outside care, medication procurement and administration, wound-care practices, documentation, and custody monitoring. Each had the power and duty to train, supervise, discipline, and correct subordinates; to promulgate and enforce policies; and to implement corrective actions when constitutional violations were evident.

56.     Merritt and Weber knew or were on repeated notice of systemic deficiencies at CCDC that foreseeably endangered detainees with acute medical needs—especially those with post-operative wounds and uncontrolled diabetes. Those deficiencies included: failures to perform and document required visual checks; tolerance of obstructed sightlines; inconsistent or delayed access to physician-ordered care; delegation of clinical tasks to inadequately trained or unlicensed personnel; failure to procure and administer prescribed medications reliably; and unsanitary housing conditions that increased infection risks.

57.     Merritt and Weber were specifically on notice that Mr. Morphis was a newly postoperative, insulin-dependent diabetic whose foot amputation site required daily wound care, off-loading, monitoring, and timely escalation if infection or decompensation appeared. They were, at minimum, constructively aware through CCDC intake/classification, on-site medical communications, repeated transport/appointments, and detainee grievances/requests that Mr. Morphis required consistent wound care, glycemic control, and close observation to prevent infection and osteomyelitis progression.

**Exhibit 2**

58.    Despite that knowledge, Merritt and Weber failed to train and supervise line staff to: (a) follow outside clinicians' orders for daily dressing changes and monitoring; (b) timely obtain, administer, and document prescribed medications and insulin regimens; (c) promptly escalate concerning vitals, symptoms, and wound changes to qualified medical decision-makers; (d) ensure unobstructed visual checks at required intervals; and (e) maintain basic sanitation in cells and showers to mitigate infection risk for post-surgical detainees.

59.    Merritt and Weber also maintained, ratified, or deliberately tolerated customs that predictably resulted in constitutional violations, including customs of: (a) deferring or denying outside evaluation and specialty care unless deterioration became undeniable; (b) allowing cost or convenience to dictate whether medications were procured—at times forcing families to supply medications instead of obtaining them through normal channels; (c) permitting unqualified staff to perform or omit clinical tasks such as wound care and monitoring; and (d) accepting incomplete or after-the-fact documentation in lieu of true observation and supervision

60.    These failures were not isolated mistakes. The same types of lapses—missed sight checks, obstructed views, dirty housing areas, inconsistent documentation, and failures to report and escalate serious medical issues—were known, recurring problems at CCDC before and during Mr. Morphis's incarceration. Yet Merritt and Weber did not implement or enforce durable corrective measures (e.g., targeted training, staffing adjustments, meaningful audits, discipline, or policy changes) to prevent the very harms that befell Mr. Morphis.

61.    The foregoing acts and omissions by Merritt and Weber—individually and together—amounted to deliberate indifference to a substantial risk of serious harm to Mr. Morphis, and were causally connected to the underlying constitutional violations alleged in Count I. Their supervisory failures were a moving force behind the denial and delay of medical care and monitoring that allowed

**Exhibit 2**

Mr. Morphis's infection to progress, necessitated additional surgical intervention, prolonged his pain and suffering, and contributed to his death.

.62.    At all relevant times, Merritt and Weber acted under color of state law. Their conduct was willful, wanton, reckless, and in callous disregard of Mr. Morphis's clearly established Fourteenth Amendment rights to adequate medical care and reasonable safety as a pretrial detainee, warranting an award of compensatory and punitive damages against them in their individual capacities.

## COUNT III: 42 USC 1983: MUNICIPAL/OFFICIAL CAPACITY LIABILITY (Monell) (AGAINST: COUNTY, MERRIT, WEBER)

Plaintiff incorporates all previous allegations and statements and further alleges as follows:

63.    The Board of County Commissioners of Comanche County ("the County")—acting through final policymakers including the Sheriff and Jail Administrator—maintained policies, practices, and customs that, separately and together, were the moving force behind the denial of necessary medical care to pretrial detainees at the Comanche County Detention Center ("CCDC"), including Rickey Morphis.

64.    The County had actual notice, before and during Morphis's incarceration, that CCDC's medical-care and safety systems were chronically deficient. In June 2023, the Oklahoma State Department of Health ("OSDH") found the facility not in substantial compliance, citing failures to conduct and document hourly sight checks, delayed reporting of inmate deaths, widespread sanitation problems, improper razor control, and mattresses that could not be disinfected.

65.    On May 14, 2024—squarely overlapping Morphis's period of confinement—OSDH again found CCDC "not in substantial compliance," documenting, among other things, lack of a written classification policy, missing shift counts, routine failures to document hourly sight checks (and 30-minute checks for lockdown cells), physical obstructions that prevented visual checks, failures to notify OSDH when inmates were transferred to outside hospitals for serious injuries, and pervasive unsanitary conditions (including cells with feces on walls/doors and strong urine odors, and dirty showers).

**Exhibit 2**

66.     Despite this sustained notice, the County failed to implement corrective training, staffing, supervision, and monitoring systems to ensure constitutional medical care for detainees with serious conditions, such as recent surgical wounds and insulin-dependent diabetes. The same systemic shortcomings persisted through Morphis's incarceration.

67.     The County had actual knowledge that Morphis entered custody on December 4, 2023 with recent toe amputation and mobility limitations—the arresting officer noted he had "recently had two toes amputated and needed assistance," and CCDC accepted custody that same night

68.     Outside treating providers promptly informed CCDC that Morphis was not receiving proper wound care inside the facility and issued explicit orders for daily dressing changes (quarter-inch iodoform gauze, Xeroform, and dry dressing) and weekly foot checks to track diabetic foot ulcers. Those directives placed the County on direct notice of a serious and continuing medical need and of specific, easily implemented nursing tasks required to meet that need.

69.     Providers also documented that jail personnel requested changes to Morphis's insulin regimen and that the jail mis-implemented orders—e.g., a change to Lantus "20 units twice a day" was actually given as "20 units once a day," after which his blood sugars ran in the 200s–400s—creating substantial risk of infection and impaired healing.

70.     On information and belief, as a matter of practice the County failed to ensure timely procurement and administration of ordered medications. Family members were compelled to obtain and deliver medications to CCDC because staff refused to obtain them.

71.     The County's entrenched practices—including (a) disregarding outside physicians' written wound-care orders, (b) not ensuring continuity of prescribed medications/insulin, (c) chronically failing to perform and document required sight checks and cell rounds, and (d) permitting persistently unsanitary, contaminated housing areas—created and perpetuated a culture in which obvious, serious medical needs of detainees were not addressed with reasonable medical attention.

14

**Exhibit 2**

72.    These practices were not isolated mistakes but regular operating procedures known to, condoned by, and uncorrected by County policymakers despite repeated OSDH citations and the predictable risk of harm to medically vulnerable detainees such as Morphis. The County's failure to train and supervise detention and medical staff to follow provider orders, to timely obtain medications, to conduct required observations, and to maintain sanitary conditions amounts to deliberate indifference.

73.    As a direct and proximate result of these policies and customs, Morhis's post-operative wound was not appropriately cleaned, packed, and monitored; his diabetes was poorly controlled; he repeatedly decompensated and required inpatient care at Comanche County Memorial Hospital from January 22–29, 2024; and he continued to suffer from unresolved osteomyelitis that contributed to his death following release.

74.    The County's policies, customs, and failures described above were the moving force behind the constitutional deprivation suffered by Morphis—i.e., denial of objectively reasonable medical care to address serious medical needs—causing pain, prolonged infection, loss of tissue and function, and ultimately wrongful death.

75.    Plaintiff seeks all available relief against the County under § 1983, including compensatory damages, attorneys' fees and costs under 42 U.S.C. § 1988, and any other just relief.

### COUNT IV: 42 USC 1983: DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS (AGAINST: PFITZER, DARRIGAN, RICHARDSON, MATTHESON, LEACH, JONES, DESSALEGN, FNU SAWYER, MADA, COTTON, AND SELLERS)

Plaintiff incorporates all previous allegations and statements and further alleges as follows:

76.    At all relevant times, the Medical Defendants were employees and/or agents of Comanche County Hospital Authority ("CCHA") and its owned facilities, including Comanche County Memorial Hospital, Memorial Medical Group, and Lawton Community Health Center, and they evaluated and treated Mr. Morphis while he was a county detainee. By providing medical care to a jail inmate in

**Exhibit 2**

coordination with jail staff as part of CCHA's public trust operations, the Medical Defendants acted under color of state law.

77.     Mr. Morphis presented with obvious, serious medical needs—insulin-dependent diabetes, recent toe amputation with an open surgical wound, and asthma—recognized by the Medical Defendants in their own records.

78.     The Medical Defendants knew he was incarcerated and that the jail's performance of his care was problematic. For example, clinic notes document he was "currently in the county jail," that jail personnel requested changes to his insulin regimen despite resulting hyperglycemia, and that jail conditions were triggering his asthma; orders were written that the jail would need to carry out (e.g., nebulizers, inhalers, and daily wound care).

79.     Surgical follow-up notes further record that Mr. Morphis was not receiving proper wound care at his facility; the provider called the facility nurse, issued daily dressing and weekly foot-check orders, and later documented the jail was "starting to not take care of it." Yet Mr. Morphis was returned to the same environment without effective escalation to ensure those essential directives would actually be carried out.

80.     The Medical Defendants also knew or should have known that critical medications were not consistently supplied to Mr. Morphis while jailed.. Despite this red flag for continuity-of-care failure, the Medical Defendants did not take adequate steps to secure reliable medication access or to adjust the plan accordingly.

81.     As his condition deteriorated, Mr. Morphis required inpatient admission from January 22–29, 2024 under the care of Comanche County Memorial Hospital (attending Metty Dessalegn, M.D.), culminating in further right-foot surgery. Even then, discharge planning and follow-up failed to ensure a workable wound-care and infection-control plan that the jail would and could execute, despite the prior, documented noncompliance.

**Exhibit 2**

82.     n total, the Medical Defendants consciously disregarded a substantial risk of serious harm by: (a) deferring to jail staff they knew were not performing ordered wound care; (b) altering insulin at the jail's request despite uncontrolled glucose and medication-continuity problems; (c) failing to timely escalate to higher-level interventions when their directives were ignored; and (d) discharging and returning Mr. Morphis to known, unsafe conditions without safeguards. This conduct was objectively unreasonable and undertaken with deliberate indifference to his serious medical needs.

83.     The Medical Defendants' acts and omissions were a moving force behind Mr. Morphis's prolonged suffering, progression of infection and osteomyelitis, and his eventual decompensation and death. Plaintiff seeks compensatory and punitive damages against these individuals under 42 U.S.C. § 1983.

## COUNT V: 42 USC 1983: MONELL LIABILITY
## (AGAINST: CCHA)

Plaintiff incorporates all previous allegations and statements and further alleges as follows:

84.     CHA is a municipal entity/public trust that owns and operates Comanche County Memorial Hospital and affiliated clinics that treated Mr. Morphis during his incarceration and thereafter, including MMG Surgery and Lawton Community Health Center ("LCHC"). Clinical notes reflect that MMG Surgery and LCHC providers evaluated and treated Mr. Morphis during December 2023–January 2024.

85.     Acting under color of state law by providing constitutionally required medical care to a pretrial detainee/inmate, CCHA—through its employees and agents—maintained policies, practices, and customs that were the moving force behind the deprivation of Mr. Morphis's Fourteenth Amendment right to adequate medical care.

86.     CCHA clinicians repeatedly documented that Mr. Morphis was not receiving proper wound care "at his facility," and issued explicit written instructions (daily dressing/packing, Xeroform and dry dressings; weekly foot checks). CCHA providers relayed these orders to jail personnel yet failed to ensure

17

**Exhibit 2**

implementation, escalation, or continuity mechanisms when non-compliance persisted. The 12/11/2023 MMG Surgery note states: "patient has not been receiving the proper wound care at his facility... instructed [facility nurse] on what I want for wound care... daily dressing changes... [and] weekly feet checks." The 1/2/2024 note adds he was "concerned... staff at his facility [were] starting to not take care of it." These charted facts evidence a known pattern of non-adherence by the jail and a CCHA practice of issuing orders without ensuring continuity or taking reasonable steps to protect the patient when non-adherence was known.

87.    On 12/20/2023, an LCHC progress note reflects that "CCDC would like [the] pt on a sliding scale for insulin," and the CCHA clinician changed Mr. Morphis's insulin regimen accordingly—despite concurrent poor glycemic control and recent hypoglycemia. This demonstrates a custom of accepting jail-driven medication directives, rather than exercising independent medical judgment calibrated to the patient's condition.

88.    Despite repeated red flags—open post-amputation wound with depth, pain, erythema, positive cultures ordered, abnormal differential with neutrophilia (12/11/2023), and the patient's repeated returns for the same problem—CCHA's system failed to implement heightened monitoring, case management, or timely infection-control interventions designed for incarcerated patients who depend on third-party custodians for daily care.

89.    CCHA discharged and transitioned Mr. Morphis back to jail custody knowing the facility had not been performing ordered wound care, without ensuring a reliable mechanism for daily dressings, medication procurement, or prompt return-to-care triggers. The record shows serial clinic directives to the jail and the patient's continued deterioration culminating in a January 22–31, 2024 inpatient admission and further operative intervention—events consistent with systemic continuity-of-care failures. Itemized hospital records confirm that inpatient admission and surgical services during that period.

90.    CCHA failed to train and supervise its clinicians on the heightened risks and required safeguards

18

**Exhibit 2**

when treating incarcerated patients dependent on custodial staff for daily wound care, glucose management, and medication access. The persistence of the same breakdowns over multiple encounters—despite charted knowledge of non-compliance at the jail—demonstrates deliberate indifference at the policy level.

91.    CCHA's own records put it on actual notice that jail personnel were not following medical orders and that Mr. Morphis was deteriorating (e.g., repeated post-op visits for the open amputation wound; orders for cultures and imaging; concerns that staff had stopped taking care of the wound; subsequent hospitalization). The risk of serious harm from an unhealed diabetic amputation site—progressing to osteomyelitis, sepsis, and death—was obvious.

92.    These policies and customs—particularly the failure to ensure order compliance and medications, deference to non-medical jail directives, and inadequate escalation in the face of known non-adherence—were the moving force behind the denial of constitutionally adequate medical care and Mr. Morphis's injury and death. He required further hospitalization and surgery in January 2024 and ultimately died on or about August 1, 2024, with complications of unresolved osteomyelitis as a contributing factor.

93.    CCHA's conduct described herein amounts to deliberate indifference at the institutional level, actionable under Monell, and proximately caused Mr. Morphis's pain, suffering, lost chance of survival, and death, and the Estate's and statutory beneficiaries' damages.

### COUNT VI: PROFESSIONAL NEGLIGENCE/MEDICAL NEGLIGENCE
### (AGAINST: CCHA, PFITZER, DARRIGAN, RICHARDSON, MATTHESON, LEACH, JONES, DESSALEGN, SAWYER, MADA, COTTON, SELLERS)

Plaintiff incorporates all previous allegations and statements and further alleges as follows:

94.    At all relevant times, CCHA owned, operated, and/or controlled Comanche County Memorial Hospital and affiliated clinics, including Memorial Medical Group ("MMG") and Lawton Community Health Center ("LCHC"), and provided inpatient and outpatient care to Mr. Morphis from December

**Exhibit 2**

2023 through July/August 2024, including an inpatient admission from approximately January 22–31, 2024.

95.     CCHA, by and through its employees, agents, and/or ostensible agents, owed Mr. Morphis the duty to exercise the degree of care, skill, and diligence ordinarily possessed and exercised by reasonably prudent hospitals, physicians, and advanced practice providers under the same or similar circumstances—including timely assessment, diagnosis, wound care and infection management, glycemic control for an insulin-dependent diabetic, continuity and coordination of care across inpatient/outpatient settings, discharge planning, and effective communication with the correctional facility responsible for his custody and daily care.

96.     The acts and omissions of MMG and LCHC clinicians—including but not limited to Christian Sellers, PA-C; Kathryn Jones, D.O.; Mark Cotton, D.O.; and other CCHA-affiliated physicians involved in Mr. Morphis's surgical follow-up and inpatient care—were undertaken within the course and scope of their employment and/or agency with CCHA; accordingly, CCHA is vicariously liable for their professional negligence. Records reflect that on December 11, 2023 MMG documented the patient was not receiving proper wound care at "his facility," issued specific daily dressing-change instructions, and directed weekly foot checks; further clinic notes on December 19, 2023 (suture removal; wound cultures) and January 2, 2024 (persistent open wound; concern the facility was "starting to not take care of it") show ongoing involvement and knowledge of risk.

97.     Independently of vicarious liability, CCHA breached its direct, non-delegable duties as a hospital system to implement and enforce reasonable policies and procedures to ensure safe, coordinated care for a high-risk postoperative, insulin-dependent patient in custody. CCHA failed to: (a) ensure compliance with the post-amputation wound care orders it transmitted to the jail (daily iodoform/Xeroform packing and dressing changes; weekly diabetic foot checks), and to timely escalate when noncompliance or deterioration was reported; (b) timely and adequately monitor, culture, image,

**Exhibit 2**

and treat the evolving infection at the amputation site, and to arrange earlier specialty escalation or inpatient management before the condition progressed; (c) provide safe medication reconciliation and glycemic management, including changes to Mr. Morphis's insulin regimen requested by jail personnel without adequate follow-up to verify implementation and control (with reported wide glucose excursions after regimen changes); (d) implement systems for reliable communication and continuity-of-care between CCHA clinics/hospital and the correctional facility despite repeated red flags that wound care and monitoring were inconsistent; (e) ensure appropriate discharge planning, follow-up, and infection eradication following the January 22–31, 2024 admission and procedure(s), allowing persistent osteomyelitis and a non-healed operative site to continue to smolder.

98.     These breaches are supported by the medical record: (i) 12/11/2023 MMG postoperative note documenting inadequate facility wound care and directing daily dressing changes and weekly foot checks; (ii) 12/19/2023 note documenting cultures and activity limits; (iii) 1/2/2024 note documenting an open 1 cm wound with 1–2 cm depth and concern that jail staff were no longer taking care of it as previously; (iv) 12/20/2023 LCHC note changing insulin to Lantus 20 units twice daily and placing the patient on a sliding scale at the jail with contemporaneous reports of hyperglycemia; and (v) 1/22–1/31/2024 inpatient hospitalization with operating-room–level supplies/charges consistent with additional operative intervention.

99.     As a direct and proximate result of CCHA's vicarious and corporate negligence—including failures to assure execution of wound-care orders, to timely escalate and eradicate infection, to coordinate care with the jail, and to maintain reasonable glycemic control—Mr. Morphis's postoperative wound remained non-healed, his osteomyelitis persisted and progressed, and he suffered deterioration culminating in hospitalization, additional surgical intervention, ongoing infection, pain and suffering, loss of chance of survival, and death on or about August 1, 2024.

100.    Plaintiff and statutory beneficiaries seek all damages available under Oklahoma law, including

**Exhibit 2**

wrongful-death damages, pre-death pain and suffering, medical expenses, loss of earnings and earning capacity, and loss of consortium.

101.     To the extent any of the following clinicians contend they were not acting within the scope of employment and/or agency with CCHA or were independent contractors—Gregory Pfitzer, D.O.; David Darrigan, D.O.; Heston Richardson, D.O.; Chance Matthesen, D.O.; Jordan Leach, D.O.; Kathryn Jones, D.O.; Metty Dessalegn, M.D.; FNU Sawyer; Pradeep Mada, M.D.; Mark Cotton, D.O.; and Christian Sellers, PA-C—Plaintiff pleads in the alternative that each owed and breached the professional standard of care in the evaluation, medication management, wound care, escalation, and continuity-of-care for Mr. Morphis, and that such breaches directly and proximately caused the harms described above, for which they are individually liable.

## COUNT VII: WRONGFUL DEATH
### (AGAINST: CCHA, PFITZER, DARRIGAN, RICHARDSON, MATTHESON, LEACH, JONES, DESSALEGN, SAWYER, MADA, COTTON, SELLERS)

Plaintiff incorporates all previous allegations and statements and further alleges as follows:

102.     CCHA, acting by and through Comanche County Memorial Hospital, Lawton Community Health Center, Memorial Medical Group, and its employed/agent clinicians, owed Mr. Morphis the duty to exercise ordinary care, consistent with accepted standards, in assessing, communicating, treating, and coordinating care for his diabetic foot amputation, wound management, infection control, glycemic management, and safe discharge/continuity of care while he remained in custody.

103.     Shortly after incarceration, a CCHA-affiliated surgical clinic documented that Mr. Morphis "has not been receiving the proper wound care at his facility," directed daily wound-care dressing changes and weekly foot checks, and noted purulence and tunneling—putting CCHA on explicit notice of a high risk of progression to osteomyelitis and sepsis absent strict adherence and follow-through.

104.     Within the same period, a CCHA clinic visit changed his insulin regimen (including a

Exhibit 2

jail-requested sliding scale) amid reports of worsened hyperglycemia and asthma triggers in custody—further underscoring the need for coordinated, vigilant management of infection and glycemic control.

105.    Mr. Morphis was admitted under CCHA care from January 22–31, 2024 with right-foot complications; the admission was overseen by CCHA attending Dr. Metty Dessalegn, with operative and peri-operative supplies, IV solutions, antibiotics, and repeated glucose checks documented in the facility account record.

106.    Despite repeated warnings and orders, Mr. Morphis continued to experience non-healing and infectious sequelae of the amputation site. On information and belief, family members were compelled to obtain and deliver several ordered medications because jail personnel would not, reflecting breakdowns CCHA had a duty to anticipate, communicate around, and mitigate through appropriate discharge planning, clear directives, and escalation when adherence failed.

107.    Mr. Morphis re-presented in late July 2024 and died on or about August 1, 2024. The Estate's pre-suit notice states that unresolved osteomyelitis and a non-healed amputation site remained contributing factors despite multiple opportunities for intervention—failures attributable in part to CCHA's negligent assessment, treatment, and coordination.

108.    The negligent acts and omissions of CCHA, by and through its employees/agents, were a direct and proximate cause of the deterioration, suffering, and death of Mr. Morphis, including but not limited to: (a) failure to timely and adequately treat and monitor the surgical site and infection risk; (b) failure to ensure adherence to explicit wound-care orders and to escalate when non-adherence was evident; (c) failure to coordinate necessary medications, glycemic control, and follow-up; and (d) failure to implement discharge and communication practices that reasonably accounted for the known constraints of jail custody.

109.    Plaintiff seeks all wrongful-death damages permitted by law, including: medical and end-of-life

**Exhibit 2**

expenses; the decedent's conscious pain and suffering; loss of earnings and earning capacity; burial and funeral expenses; and the grief, loss of consortium, companionship, and pecuniary loss to the statutory beneficiaries.

110.    CCHA is vicariously liable for the negligent acts/omissions of its employees and agents—including the clinicians identified in the caption—committed within the scope of employment/agency.

111.    Separately and additionally, CCHA is directly liable for negligent hiring, supervision, training, credentialing, communication, and continuity-of-care processes that foreseeably allowed breakdowns in wound care, glycemic control, and infection management described above.

112.    If any of the following—Gregory Pfitzer, D.O.; David Darrigan, D.O.; Heston Richardson, D.O.; Chance Matthesen, D.O.; Jordan Leach, D.O.; Kathryn Jones, D.O.; Metty Dessalegn, M.D.; FNU Sawyer; Pradeep Mada, M.D.; Mark Cotton, D.O.; Christian Sellers, PA-C—are determined not to have been acting within CCHA employment/agency, then each owed and breached the applicable standard of care in the assessment, treatment, and coordination of Mr. Morphis' diabetic foot wound and related conditions, and such negligence directly and proximately caused his death and the damages set out above.

## CAUSATION OF INJURIES AND DAMAGES

Plaintiff incorporates all previous allegations and statements and further alleges as follows:

113.    The injuries and damages sustained by Morphis, were produced in a natural and continuous sequence from Defendants' violation of one or more of the above-described independent constitutional duties.

114.    The injuries and damages sustained by Janway were a probable consequence from Defendants' violation of one or more of the above-described independent duties.

115.    Defendants should have foreseen and anticipated that a violation of one or more of the above-described independent duties would constitute an appreciable risk of harm to others, including Morphis.

24

**Exhibit 2**

116.    If Defendants had not violated one or more of the above-described independent duties, then Morphis's injuries, death, and other damages would not have occurred.

## AMOUNT OF DAMAGES

117.    The Plaintiff's injuries and damages are in excess of $10,000,000.00 plus attorney fees, interest, costs and all such other and further relief for which should be awarded as judgment against Defendants in an amount to fully and fairly compensate Plaintiff for each and every element of damages that has been suffered.

## PUNITIVE DAMAGES

Plaintiff incorporates all previous allegations and statements and further alleges as follows:

118. Plaintiff is entitled to punitive damages on claims brought against individual Defendants pursuant to 42 U.S.C. § 1983 as Defendants' conduct, acts, and omissions alleged herein constitute reckless or callous indifference to Janway's federally protected rights.

## DEMAND FOR JURY TRIAL

119. The Plaintiff demands a jury trial for all issues of fact presented by this action.

## RESERVATION OF ADDITIONAL CLAIMS

120. The Plaintiff reserves the right to plead further upon completion of discovery to state additional claims and to name additional parties to this action.

WHEREFORE, Plaintiff, Kelli Goodnight, as Personal Representative of the Estate of Rickey Morphis, prays for judgment against Defendants in a sum excess of $10,000,000.00 plus interest, attorneys fee, costs, and all such other relief as to which Plaintiff may be entitled.

25

**Exhibit 2**

Respectfully submitted,

ATTORNEY LEIN CLAIMED

Chris Hammons, OBA # 20233
LAIRD, HAMMONS, LAIRD, PLLC
1332 S.W. 89th Street
Oklahoma City, OK 73159
Telephone:    (405) 703-4567
Facsimile:    (405) 703-4061
E-mail: chris@lhllaw.com
Attorney for Plaintiff

**Exhibit 2**